**E-FILED**
Monday, 01 June, 2009  03:59:39 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

---

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 08-CR-20010** |
| | ) | |
| **JAMELLE CARRAWAY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## OPINION

---

On February 26, 2008, Defendant, Jamelle Carraway, was charged by Indictment (#12) with one count of knowingly possessing 50 grams or more of a mixture and substance containing cocaine base (crack), a Schedule II controlled substance, with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). On October 28, 2008, Defendant filed a Motion to Suppress (#26). The government filed its Response to the Motion to Suppress (#39) on December 22, 2008. An evidentiary hearing for the Motion to Suppress (#26) was held on January 7, 2009, the same day as Defendant's bench trial. Following the bench trial, the transcript was filed in this case on March 3, 2009. The government's Position brief (#52) was filed on April 13, 2009. Defendant filed his Reply to the Government's Response to the Motion to Suppress (#53) and his Trial Brief (#54) on May 1, 2009. The government filed its Response to Defendant's Trial Brief (#55) on May 15, 2009. For the following reasons, Defendant's Motion to Suppress (#26) is DENIED and Defendant is found GUILTY of the offense of possession with intent to distribute as charged in the Indictment.

BACKGROUND

Procedural History

Defendant and his co-defendant, Lisa Owens, were charged via criminal complaint on January 31, 2008.  On February 26, 2008, a superseding Indictment (#12) was filed.  In the Indictment, Defendant and Owens were each charged with one count of knowingly possessing 50 grams or more of a mixture and substance containing cocaine base (crack), a Schedule II controlled substance, with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).  Owens was also charged with knowingly managing and controlling a house, as lessee and occupant, and knowingly and intentionally making said house available for use for the purpose of unlawfully storing and distributing crack in violation of 21 U.S.C. § 856(a)(2).  On July 22, 2008, Owens plead guilty to the second count of the Indictment concerning controlling a house as lessee and making it available for the use and purpose of storing and distributing crack.  She was sentenced to 28 months in the Bureau of Prisons on February 13, 2009.  The first count, concerning possession of 50 grams or more of crack with intent to distribute, was dismissed by the government at sentencing. Defendant decided to waive his right to a jury trial and instead opted to proceed in a bench trial, which was scheduled for January 7, 2009.

On October 28, 2008, Defendant filed three motions to suppress.  However, on December 19, 2008, the court found the second and third motions to suppress to be moot, as the warrants challenged in those two motions did not result in the seizure of any evidence.  The government filed its Response to the Motion to Suppress (#39) on December 22, 2008.  The court set the first Motion to Suppress (#26) for an evidentiary hearing to be held with the bench trial on January 7, 2009. Following the bench trial, the official transcript of the trial and evidentiary hearing was filed on March 3, 2009.  The government's Position brief (#52) was filed on April 13, 2009.  Defendant filed

his Reply to the Government's Response to the Motion to Suppress (#53) and his Trial Brief (#54) on May 1, 2009.  The government filed its Response to Defendant's Trial Brief (#55) on May 15, 2009.

<u>Evidentiary Hearing on the Motion to Suppress (#12) and Bench Trial</u>

The first witness called to the stand was Decatur police Detective Chad Ramey.  On January 29, 2008, Ramey obtained a search warrant for 2650 South Franklin in the city of Decatur, Illinois. Ramey completed a search warrant form, as well as a complaint for a search warrant with an accompanying affidavit.  The court then admitted into evidence government's Exhibit 18A (the search warrant complaint) and 18B (the search warrant itself).  The affidavit contained details about the purchase of crack from Defendant.  Ramey then read from paragraph 14 of the search warrant complaint, which stated:

"Ramey states that between the dates of January 25th 2007 and January 29th 2007 he met again with Doe and surveillance was established of the apartment building as well as 2650 S. Franklin and none of the vehicles were present.  Doe made a telephone call to Jamelle Carraway and ordered a quantity of cocaine. Carraway agreed to sell the cocaine to Doe but told Doe he had to go and obtain the cocaine first.  Doe and his vehicle were searched and no contraband was located. Doe was issued US currency and followed directly to the meeting location and was under constant surveillance."

Ramey then stated in court that the dates of January 25, 2007, and January 29, 2007, were an incorrect typo and that the correct year should have been 2008.  Ramey had inadvertently typed 2007 instead of 2008 because the first part of the affidavit dealt with purchases from 2007.  The rest

of the facts contained in the affidavit were, to the best of Ramey's knowledge, correct.  He believed he had probable cause to take the affidavit and warrant before a judge.  On January 29, 2008, Ramey went before state Judge Thomas Little to obtain a warrant.  Ramey presented Judge Little with the documents for his review only after they had been previously reviewed by Macon County First Assistant State's Attorney Jay Scott.  Scott indicated to Ramey that he believed the warrant and complaint form itself were in correct form and supported probable cause.  Ramey then took the documents to Judge Little.  Judge Little reviewed the documents for approximately 10 minutes and, without asking any questions, signed the documents in Ramey's presence.  Based upon that warrant, a search was executed at around 6:00 p.m. on January 29, 2008, at 2650 South Franklin.

Defendant had been under surveillance that day since about 4:00 p.m.  Ramey was part of a team of six to seven officers who had Defendant under surveillance and were following him, staying in constant radio contact with each other and relaying information.  They observed Defendant at a bus depot downtown with his girlfriend, Lisa Owens, who worked at the depot.  The two of them got in a car together and left the depot headed to the 2650 South Franklin address.  Defendant and Owens arrived at the address, and the police drove their van to a side street.  Ramey joined the "Emergency Response Team" (ERT), a SWAT type team, to prepare to execute the warrant.  Defendant and Owens arrived and entered the residence at approximately 6:00 p.m., and the warrant was executed soon thereafter.

The ERT team made entry through the back door of the house.  Ramey's role in searching the house was to process it.  If evidence was located, he was notified, would go to the location, photograph it, and would later take custody of it.  Ramey entered through the back door of the residence.  Defendant was located in the bathroom area of the house and Owens was located in the

bedroom, which were both north of the kitchen.  On the kitchen counter was located a Kroger bag

and a couple of steaks.  In a kitchen cabinet was located a black plastic bag.  The cabinet had an open

glass door above the kitchen counter.  Ramey opened the glass door, which he could not see through,

and found the black plastic bag inside.  The following Exhibit 7 items were all photographs.  The

government  introduced government Exhibit 7B, the Kroger's bag photo.  Exhibit 7C were photos

of the items found within the brown Kroger style bag, which Ramey, based on his training and

experience, believed to be crack.  Exhibit 7D was then introduced, which was the photo of the black

plastic bag found in the cabinet.  Exhibit 7E was then introduced, and Ramey identified 7E, which

was found inside the plastic bag, as the photo of packages of crack.  The government then introduced

Exhibit 7F, which was a photo of the gray digital scale recovered from the cabinet below the kitchen

counter.  Also recovered were a black plastic bag from Radio Shack and a pair of scissors.  The scale

was functional and working.  The crack that was seized by Ramey from the kitchen and later from

Defendant's pocket was moist.  The amount of crack recovered in the kitchen was for distribution,

not personal use, in Ramey's professional opinion.  The actual crack rocks were as follows: 1A-

crack from Kroger bag on counter; 1B- crack from black bag in cabinet; 1C- crack from small plastic

bag behind black bag; and 1D- crack taken from Defendant's pocket.

In the northwest bedroom about $9,200 in U.S. currency was located inside a dresser drawer.

In that bedroom was a closet with men's clothing that was hanging.  The money was in bundles.

Currency being kept in this way was typical in crack distribution operations.  The currency was in

bundles of approximately $1,000.  Ramey personally searched Defendant in the home.    Inside

Defendant's pocket Ramey located a plastic bag that appeared to contain crack.  Ramey also found

a set of keys for the residence on Defendant.  Ramey also found a gun that was located in a safe in

the northwest bedroom.  Defendant was arrested and taken into custody.

Later that evening Ramey had a chance to interview Defendant at the police station.  Defendant denied knowing anything about the crack found in the house.  Defendant also, at first, denied having any clothing at the residence, but then said Owens had purchased some clothing for him and had it at the house.

After the crack was seized, Ramey sent it for analysis at the Illinois State Police Crime Lab, from whom he later received a forensic report.

Ramey also testified that documents were located at the house indicating Defendant was a resident there.  Photographs of Defendant and a Leon Turner were discovered.  Documents were found that had Defendant's name on it.

Ramey was then cross examined.  No fingerprints were recovered from the digital scale.  Also, while the northwest bedroom had men's clothing, the middle bedroom had women's clothing.

Robert Murray was then called to the stand.  Murray was a Decatur police officer and member of the ERT team who participated in the execution of the warrant at 2650 South Franklin on January 29, 2008.  Murray was one of the first officers to get to the back door and do the "knock and announce."  Murray knocked on the door and yelled "Police.  Search warrant.  Open the door." When Murray initiated the knock and announce, Defendant came to the door and looked out the door window through a blind.  Murray again yelled "Police.  Search warrant.  Open the door." The blind then quickly shut and Defendant moved away from the door.  The power to the house was on at the time of the raid, but it did go out subsequent to the officers entry when they were still in the residence.

The next witness was Aaron Roemer, a forensic scientist with the Illinois State Police.

Roemer testified that the items recovered from the Kroger like bag, the black plastic bag, and Defendant were indeed crack cocaine. The weights were as follows: Exhibit 1A- 24.3 grams, Exhibit 1B- 103.1 grams, and 1C 4.5 grams, and 1D 2.3 grams.

The next government witness was co-defendant Lisa Owens. Owens has three children and six step-children. Her children are 23, 20, and 18 years old. The 18 year old still lives with her. Owens had been working since August 2004 at Decatur Public Transit as a road supervisor and made between $25,000 and $30,000 a year. She acknowledged on the stand that she pled guilty to the charge of maintaining a drug-involved premises and that she promised to cooperate with the government. Owens also admitted to two prior convictions: a 1996 conviction from Kankakee County for possession of a controlled substance (crack) with intent to deliver and a 2001 conviction for state benefit fraud out of Macon County.

Owens first met Defendant in about June of 2007. She knew him by other names, such as "Mac", "Macmal," or "Bae." She met him through her husband. Her husband, Maurice Owens, was locked up in prison with "Big O," who was Defendant's brother. Owens went to visit her husband in prison in Centralia, Illinois. Maurice told her that Big O was going to be released from prison soon and he and "some of his guys" were going to come to Decatur and look for the "hot spots" where they could sell drugs. "Big O" introduced Defendant to Owens. Earlier in 2007 Owens had turned down Maurice's initial offer to become involved in the drug operation. Maurice then proposed using his other children's mother to find the "hot spots," but Owens objected because that woman had previously been on drugs and did not want her to return to that lifestyle. Owens then agreed to become involved in the drug activity.

Defendant and others, including Londell Easley, would go to Chicago and then arrive back

in Decatur to sell the drugs they had purchased in Chicago. Defendant told Owens they were selling crack. In August 2007, Owens's relationship with Defendant turned from sexual to romantic. Between July and November 2007 Defendant was staying "all the time" at Owens's place and had pretty much moved in. During this time he was still making trips to Chicago in a rental car rented by Owens. When Defendant went to Chicago, he would return "85% of the time" with drugs. Defendant would unpackage the drugs in front of Owens and then bag it and take it to whoever he was talking to on the phone. By bagging it, Owens meant Defendant would take the drugs out of the plastic bag, chop it or break it up, put it on the scale and weigh it out, and put it in a sandwich bag, tie it up, and then take it to whoever he wanted to take it to. The type of drug was crack. Owens identified the digital scale recovered in the January 29, 2008 raid as the one Defendant would use. Owens also identified the bags and crack recovered in the raid as typical of what Defendant would use for his drug transactions.

During the August to November 2007 period Owens would received phone calls from Defendant asking her to deliver crack for him on seven or eight occasions. Defendant would call Owens and ask her to deliver the crack for him. He would tell her where it was and she would follow his instructions. Defendant would tell her where he was storing the crack- such as at the apartment, in the closet, or in the car. Most of the time she did not know where the crack was stored. She knew what she was doing was illegal. The largest amount she ever delivered for Defendant was an "eight ball." When she delivered the drugs people gave her money which she would keep until she could give it to Defendant. When Defendant received the money, he would either store it in her purse or his clothes drawer. Owens delivered crack to Easley and someone named "Issue."

In November 2007 her relationship with Defendant became even more serious and they began

looking for a house to purchase together.  The building they were living in on Beth Boulevard in Decatur was not the nicest.  Defendant was living with her full time at this point and had keys to get into and out of her apartment.  In mid-January 2008 Defendant and Owens moved into a house at 2650 South Franklin Street in Decatur.  Owens rented the house and signed the lease.  Owens and Defendant moved in together and Defendant had keys to the house.  Owens paid the rent because she felt she was the only one responsible enough to do so.  From August 2007 to January 2008 Owens did not know Defendant to ever have a job.  She would, however, frequently see Defendant with large amounts of cash, often more than $1,000.  Owens did not have that much cash on hand, as she had to pay her bills and live paycheck to paycheck.  Owens had a safe in a bedroom at the South Franklin address that she had written down the combination for.  Defendant would store things in the safe but needed Owens to open it for him.  She had an Firearm Owner's Identification Card but did not have a gun and the card had expired.  She had never seen the gun recovered from the safe during the raid.  She never saw Defendant with a gun.

On the day of the raid, January 29, 2008, Defendant picked her up from work at the bus depot and they headed straight home to their South Franklin Street house.  When they arrived at the house Owens went into the kitchen and washed off some steaks for dinner.  She then went to the bathroom and heard what she described as a "train" or "tornado."  She went to the bed and started praying and the next thing she knew there was a "guy over [her] with a big gun."  It was the police.  About an hour after the search began the power went off.

Owens did not recognize the plastic bags in the picture recovered in the kitchen.  She did not remember them being there.  She denied the cash recovered in the bedroom drawer was hers.  Defendant kept his clothing in the northwest bedroom in the closet and drawers.  Owens remembered

Defendant keeping check stubs and a letter from his probation officer at the house.  Defendant and Owens had only been in the South Franklin Street house two and a half weeks before the raid happened.  Owens testified that the crack recovered at the raid was not hers.  She knew it was Defendant's crack because it was in his possession and no one else had access to the house besides her and Defendant.  She had previously seen Defendant with crack at the Franklin address, but not in the enormity the police found on January 29, 2008.  One time since moving into the address, Owens had delivered crack for Defendant to Issue.  Owens said she has always kept a job and kept her nose clean until she met Defendant.  She participated in the drug operation because of her feelings for Defendant.

On cross examination Owens revealed she was arrested in the 1996 possession conviction when her car was stopped on her way to visit her husband Maurice in prison.  She had the drugs on her to deliver to Maurice.  Her next felony offense, the conviction for benefits fraud, occurred after her house burned down and she had just started working a new job.  She had been on state aid and only committed the fraud to keep feeding her family.  She told the judge at the time, and still maintained, that she would do it again if she was in a similar situation to prevent herself and her children from being homeless.  Owens denied she had lied in this court.  She said she tried to talk her husband out of the drug operation plan initially.  She did not think of herself as dealing in drugs, but rather "delivering" drugs.  Owens would use the digital scale to weigh out crack when following Defendant's instructions.  She never called the police on Defendant as she believed he was just selling what remained of his drugs and would soon be going straight.  Owens said she did a lot of stuff but dealing drugs was not one of them, as she had a job at Decatur Public Transit and was a Christian.  She was simply helping Defendant get rid of the drugs so they could be taken out of her

house.

Defendant elected not to testify, and both sides then rested.

ANALYSIS

Motion to Suppress

As a preliminary matter, the court must first address Defendant's Motion to Suppress (#26). In his motion, Defendant notes that the affidavit used to support the warrant contains an erroneous date concerning an informant's purchasing of drugs from Defendant, namely January 25 and 27, 2007, instead of the correct January 25 and 27, 2008. Defendant also claims there is no report from Ramey or any other officer that they observed drugs in the residence to be searched. Defendant requests a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).

The government responds that Defendant has failed to comply with any of the requirements under Franks so as to invoke a hearing. The government contends Defendant has not specifically alleged which facts within the affidavit are false, nor does he include any of the required affidavits from witnesses contradicting the facts in the affidavit made in support of the search warrant. Further, the government contends that even if Defendant had followed the necessary steps to raise probable cause as an issue, there is no evidence in the record that would support suppression under Franks. Defendant counters in his reply that the fact that Judge Little missed the improper dates in the affidavit suggests that either (1) Judge Little could not reasonably find probable cause since there would be no substantial basis for finding such cause with the dates unchanged or (2) Judge Little did not read the affidavit closely and was acting as a rubber stamp for the police.

A police officer's decision to obtain a warrant is prima facie evidence of good faith. United States v. Woolsey, 535 F.3d 540, 546 (7th Cir. 2008). A defendant, however, may rebut this

presumption by showing that the judge who issued the warrant departed from his detached role and acted as a rubber stamp for the police, or that the affiant intentionally or recklessly misled the judge, or that the supporting affidavit is so lacking in indicia of probable cause that an officer's belief in its existence would have been entirely unreasonable, or that the warrant itself is so facially deficient that the executing officers could not reasonably believed it to be valid.  Woolsey, 535 F.3d at 546.

Defendant essentially seems to be advancing two main arguments: (1) the warrant lacked probable cause because no officer observed drugs in the 2650 South Franklin Street address and there is no evidence the informant was reliable and  (2) Judge Little could not reasonably find probable cause due to the dates being wrong or he abandoned his role as a neutral and detached decision maker in issuing the warrant.  Defendant's argument must fail on both these points.

First, with respect to the warrant itself, it did, on its face, contain sufficient probable cause for its issuance.  Defendant has provided no evidence that informant Doe from the affidavit was not reliable.  Further, paragraphs 1 through 13 of the affidavit detail previous drug buys between Doe and Defendant at prior addresses.  Paragraph 14 describes a drug buy between Doe and Defendant in January 2008.  Ramey met with Doe and surveillance was established on the residence of 2650 South Franklin.  Doe called Defendant and ordered a quantity of crack.  Defendant agreed to sell the crack to Doe but told Doe he had to go and obtain the crack first.  Doe was issued U.S. currency and followed directly to the meeting location and was under constant surveillance.  Doe called Defendant again.  Defendant advised Doe he was still on his way to obtain the crack.  At the same time, another detective advised Ramey that a black male had arrived at 2650 S. Franklin driving the tan Chrysler registered to Lisa Owens.  The black male was observed entering the residence through the back door and remained inside for five minutes before returning to the car.  The black male then drove directly

2:08-cr-20010-MPM-DGB   # 56   Page 13 of 19

to the meeting and met with Doe.  The black male was Defendant.  Doe then met with Ramey and handed him some of the crack obtained from Defendant and it field tested positive for crack.  Doe said Defendant was the subject driving the tan Chysler and the one who sold him the crack.  All of the above, as put by Ramey in the affidavit, establishes probable cause for the search of the Franklin Street address for drugs.  Defendant arranged to meet the informant at a location to sell him drugs but told him he had to go pick up the drugs first.  Defendant was seen to enter the residence at 2650 South Franklin and then drove to meet Doe and supplied him with the drugs.  The warrant contains probable cause to search the residence.

As to the second argument concerning the role of Judge Little, Defendant has provided no evidence that the judge could not find probable cause or had abandoned his detached and neutral role.  The 2007 date in paragraph 14 is clearly a typo.  Anyone reading the affidavit realizes that it is done in chronological order.  It is eminently reasonable that Judge Little read the date as 2008 since the events in question took place just days before he signed the warrant.  The warrant itself, as the court stated above, provides sufficient probable cause for its issuance.  Further, there is no evidence Judge Little acted as a rubber stamp.  Ramey testified that Little read the affidavit and warrant for about 10 minutes before issuing it.  Simply because he did not inquire about the typo does not mean he abandoned his judicial role.  Reading the affidavit in context with regard to the chronology presented, it is clear the "2007" in paragraph 14 is a typo and the officer meant "2008."  The warrant contains sufficient probable cause for a search of the residence at 2650 South Franklin.  Defendant's Motion to Suppress (#26) is DENIED.

Bench Trial Verdict

Defendant argues that the he cannot be found guilty beyond a reasonable doubt of possession

-13-

of 50 or more grams of crack with intent to distribute because he was not in possession of the crack

in the kitchen that put the total crack amount above 50 grams.  Plus, Defendant argues that Lisa

Owens is not a credible witness against him.  Defendant seems to argue that the crack may have

belonged to Owens, and that in any event, the evidence is all circumstantial and is not sufficient to

convict him beyond a reasonable doubt.  The government counters that all of the circumstantial

evidence combined with the credible testimony of Lisa Owens and the police proves Defendant

guilty beyond a reasonable doubt.

Defendant was charged with knowingly possessing 50 grams or more of a mixture and

substance containing crack with the intent to distribute.  Under 21 U.S.C. § 841(a)(1) "it shall be

unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess

with intent to manufacture, distribute, or dispense, a controlled substance."  The three elements

required for a conviction under 21 U.S.C. § 841(a)(1) are as follows: (1) knowing or intentional

possession of crack; (2) possession of crack with the intent to distribute it; and (3) knowledge that

the material is a controlled substance.  United States v. Campbell, 534 F.3d 599, 605 (7th Cir. 2008).

In this case, it is clear from the evidence that Defendant knew crack was a controlled

substance.  Further, if the court were to find Defendant to be in possession of all the crack recovered

in the search of 2650 South Franklin Street, there is ample evidence to prove beyond a reasonable

doubt that he possessed that crack with the intent to distribute it.  Detective Ramey testified that the

crack was for distribution as the  amount recovered was far to large for personal use.  This fact,

combined with the evidence that the drugs were also found with packaging materials and the scale

for weighing out drugs, supports an inference that they were intended for distribution.  See United

States v. Bernitt, 392 F.3d 873, 879 (7th Cir. 2004).  Therefore, the key determinative question is

whether Defendant can be said to be in possession of not just the crack found on his person, but also

the crack recovered in the kitchen.

Possession can be shown by proving either actual or constructive possession. Campbell, 534

F.3d at 605.  Actual or constructive possession can be proven using either direct or circumstantial

evidence.  Campbell, 534 F.3d at 606.  Constructive possession requires proof that a defendant had

the power and intent to exercise control over the drugs.  Campbell, 534 F.3d at 606.  A defendant

may exercise ownership, dominion, authority, or control over the drugs himself or through

intermediaries.  Campbell, 534 F.3d at 606.  A defendant has control of the drugs when he has the

authority, not legal authority, but the recognized authority in his criminal milieu to possess and

determine the disposition of the drugs and likely had some appreciable ability to guide their destiny.

Campbell, 534 F.3d at 606.  The person who owns the drugs may be convicted even if he does not

physically "possess" them.  United States v. Johnson, 137 F.3d 970, 974 (7th Cir. 1998).  However,

the Seventh Circuit Court of Appeals, to ensure that the doctrine of constructive possession does not

ensnare innocent bystanders, especially when possession is not exclusive, makes the government

establish a nexus between the defendant and the drugs.  Campbell, 534 F.3d at 606.

> "'Mere proximity to the drug, mere presence on the property where it is
>
> located, or mere association, without more, with the person who does control the
>
> drug or property on which it is found, is insufficient to support a finding of
>
> possession." Campbell, 534 F.3d at 606, citing United States v. DiNovo, 523 F.3d
>
> 197, 201 (7th Cir. 1975).

In United States v. Jackson, 51 F.3d 646 (7th Cir. 1995), the police raided a basement

apartment and arrested Jackson, after he initially ignored their orders to get down and walked to the

back of the apartment and reached for a gun on the floor under a pile of clothes.  Jackson, 51 F.3d

at 649.  Jackson denied he was reaching for the gun.  Another man, Rodriguez was also arrested.

After securing the two men, the officers searched the apartment and seized, among other things, 33

grams of cocaine, walkie-talkies, a digital scale from a kitchen shelf, 49 grams of crack from a closet

shelf in the first bedroom, 20 grams of cocaine in a leather pouch found on a closet shelf in a second

bedroom, and a gram of cocaine in a jacket.  Pagers and lots of cash were also recovered from the

two men.  Rodriguez claimed to live at the apartment and paid $500 rent.  Jackson claimed to live

at a different address.  Officers did find a receipt in a second duffle bag from a power company with

Jackson's name and a different address on it.  The officers also testified that they discovered sets of

keys for the apartment on both Rodriguez and Jackson, but Jackson denied having the keys.  At trial,

the landlord testified that he rented the apartment to both men, but in an interview immediately

following the raid he told police he only rented to Rodriguez and did not receive any money from

Jackson.  A jury convicted Jackson of possession with intent to deliver in violation of 21 U.S.C. §

841(a)(1) and also of the gun charge.

One of the grounds on appeal for Jackson was that his possession conviction should be

vacated on sufficiency of the evidence grounds because the police found no cocaine or firearms on

his actual person and because he did not exercise control over any of the guns or drugs found in the

apartment.  The Seventh Circuit rejected that argument.  Finding Jackson had constructive

possession and looking at the evidence in the light most favorable to the government, the court

stated:

"[A] reasonable jury easily could have concluded that Jackson was in

possession of the cocaine found in the apartment and that he was in control of the

contents of the apartment.  Government witnesses testified that Jackson rented and had keys to the apartment.  Other testimony identified Jackson as one of the two individuals who rented the apartment.  The raid uncovered documents associated with Jackson inside the apartment.  The police discovered over 100 grams of cocaine in the apartment, just feet from where the officers apprehended Jackson.  The mere fact that none of the cocaine was found on Jackson's actual person is not dispositive."  Jackson, 51 F.3d at 655.

First, the court must address the issue of Lisa Owens's credibility.  Defendant has made much of the fact that Owens participated in the drug operation, took a plea deal in exchange for her cooperation and testimony, and has two prior felony convictions.  The court has had the opportunity to observe Lisa Owens on the stand and, in the court's judgment, Owens is a credible and truthful witness.  Therefore, the court will consider as credible Lisa Owens's testimony.

Based on the testimony of Lisa Owens and the strong circumstantial evidence, the court concludes that there is sufficient evidence, beyond a reasonable doubt, that Defendant had constructive possession of the crack found in the apartment so as to convict him of possession of 50 or more grams of crack with intent to distribute.

First, the testimony of Lisa Owens established that Defendant was dealing drugs from the house.  She had, at Defendant's instructions, delivered crack to people in exchange for money that she then gave to Defendant.  Defendant had the run of the house, being able to come and go as he pleased, as he had keys.  He lived with her at the house, as he had at the previous address.  Owens testified that Defendant kept the cash from the drug deals in a drawer in the bedroom.  Owens knew Defendant had crack stashed in the house for the drug deals.  Owens testified that the crack

recovered during the search of the South Franklin address was not hers.  Owens testified that

Defendant had crack stashed around the apartment and she had seen Defendant place crack in bags

similar to the ones recovered in the search that contained the large amounts of crack (although she

did not recognize the actual bags recovered during the raid).  She knew it was Defendant's crack

because it was in his possession and no one else had access to the house besides her and Defendant.

She had previously seen Defendant with crack at the Franklin address, but not in the enormity the

police found on January 29, 2008.  One time since moving into the address, Owens had delivered

crack for Defendant to "Issue."

There is also strong circumstantial evidence that the Defendant "possessed" the crack found

at the scene.  Defendant had keys to the apartment so he could come and go as he pleased.  He had

his clothing in a closet in a bedroom at the home.  Defendant had photographs and a letter from his

probation officer at the home.  Defendant himself had crack on his person when arrested.  Defendant

was seen by Officer Murray through the back door leading to the kitchen after the police announced

their presence.  Defendant just been in the kitchen.  The crack recovered on Defendant himself, the

kitchen counter, and the cabinet was all moist.  Police also found large amounts of cash  belonging

to Defendant that, according to the testimony of Detective Ramey, was consistent with drug

trafficking.  The cash was in the drawer containing Defendant's boxer shorts.

All of this evidence shows that, while Defendant may not have had actual possession of the

more than 100 grams of crack found, he did have constructive possession in that he had the authority

in his criminal setting to possess and distribute the crack.  See Campbell, 534 F.3d at 606.  He

weighed, cut up the crack, arranged the crack deals, and delivered the crack to his customers,

whether through himself or Lisa Owens.  Owens denied the crack was hers and said no one besides

herself and Defendant had access to the house.  Defendant was in the kitchen, standing just feet away

from the crack on the kitchen table, counter, and cabinet at the moment the search commenced.  The

circumstantial evidence, combined with the testimony of Lisa Owens, establishes beyond a

reasonable doubt that the crack in the kitchen belonged to Defendant so as to satisfy "possession"

of the crack under 21 U.S.C. § 841(a)(1).  Defendant is hereby found GUILTY of possession of 50

or more grams of crack cocaine with intent to distribute pursuant to 21 U.S.C. § 841(a)(1) as charged

in Count I of the Indictment.

IT IS THEREFORE ORDERED:

(1) Defendant's Motion to Suppress (#26) is DENIED.

(2) Defendant is hereby found GUILTY of possession of 50 or more grams of crack cocaine

with intent to distribute pursuant to 21 U.S.C. § 841(a)(1) as charged in Count I of the Indictment.

(3) This case remains set for a status conference on June 19, 2009, at 1:30 p.m., before this

court, in Courtroom A in Urbana.

ENTERED this 1st day of June, 2009

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE